## Day's Admrx. v. South Covington & Cincinnati Street Railway Company.

(Decided November 21, 1919.)

Appeal from Kenton Circuit Court
(Criminal, Common Law and Equity Division).

Master and Servant—Direct Command—Assurance of Safety—Promise of Protection—Assumption of Risk—Question for Jury.—Defendant's trolley wire was supported by span wires strung from opposite poles. Defendant's foreman placed a ladder against the trolley wire and directed plaintiff to ascend the ladder and cut one of the span wires, at the same time assuring plaintiff that it was safe and saying that though the trolley wire might sag a little, "I will guide the ladder and hold you": Held, in view of the foreman's direct command, assurance of safety and promise of protection, that it was a question for the jury whether the danger was so obvious and imminent that an ordinarily prudent person in plaintiff's situation would have refused to chance it.

B. F. GRAZIANI and GALVIN & GALVIN for appellant.

LOUIS F. BROWN for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Reversing.

William Day brought this suit against the South Covington & Cincinnati Street Railway Company to recover damages for personal injuries. At the conclusion of the evidence, the court directed a verdict in favor of the defendant. After prosecuting an appeal, the plaintiff died, and the appeal was revived in the name of his administratrix.

The defendant operates a street railroad in the city of Dayton. The electricity that propels its cars is generated at a central plant and distributed by means of a trolley wire stretched about twenty feet above the ground, and running parallel with and in the center of the two rails upon which the cars are moved. The trolley wire is supported by a number of span wires which extend from the trolley wire to the poles on each side of the street, and are attached to the trolley wire by means of a comb and cap. At the time of the accident, Day was employed with other men in removing the old poles which supported the span wires, and replacing them with new poles. He had been engaged in this particular work for five or six weeks. Prior to that time he had driven the trouble wagon for defendant for several

months, and had also worked for the Union Light, Heat & Power Company in attaching and fixing its wires. On the occasion of the accident, the company's foreman directed Day to ascend the ladder and cut the span wire near the trolley wire, so that the pole supporting the span wire could be removed. Day placed the ladder against the span wire, and put his foot upon the first rung of the ladder. The foreman said, "Wait a minute." Day stepped down and the foreman placed the ladder against the trolley wire and told Day to cut the span wire about a foot from the trolley wire. Day asked the foreman if it was safe to go up there. The foreman replied that it was safe, and after telling Day that the trolley wire might sag a little, said, "I will guide the ladder and hold you." Day had never done that kind of work with the ladder against the trolley. When he started up, the foreman was standing at the foot of the ladder. He cut the span wire and the ladder began to drop with a sudden jerk. He then threw away the cutters and tried to grab something to hold to. The swaying of the ladder threw him off, breaking his arm and otherwise injuring him. On cross-examination he stated that he had about three years' experience in electrical work. While working for the Union Gas & Electric Company he drove a team most of the time, and handed the tools up to the linemen. He did not climb the poles. While working for the Union Light, Heat & Power Company he was engaged in putting on new cross arms. For the first year that he worked for the defendant he drove the trouble wagon, which was a one-horse wagon with a ladder which could be raised up in the form of an "A," and fastened with a hook. The ladder was used for the linemen to get up and repair the wire. While driving the wagon, he frequently went up on the ladder to hand material to his partner and to help pull the rope used to raise the trolley wire. Before the trolley wire was cut, there was probably eighteen inches of slack between the sections. After the cutting, maybe the slack was thirty-six inches. When he cut the wire, he did not know it would sag that much. Mardis assured him it was safe.

There was no plea of contributory negligence, so that feature of the case is eliminated. Manifestly, if the foreman knew, or by the exercise of ordinary care could have known, that it was dangerous to do the work in the

manner directed, then the defendant was liable unless plaintiff assumed the risk. There is a broad distinction between the law of assumed risk as applied to the servant who acts upon his own initiative, and as applied to the servant who not only acts in obedience to a direct command from the vice principal of the master, but receives from him an assurance of safety. In the former case the servant assumes the risk of those dangers which are known and appreciated by him, or which are so obvious that an ordinarily prudent person in his situation would know and appreciate them. In the latter case the servant does not assume the risk unless the danger is so obvious and imminent that an ordinarily prudent person would refuse to do the work, and usually this is a question for the jury. Borderland Coal Co. v. Kirk, 180 Ky. 691, 203 S. W. 534. Here, the master was present in the person of his foreman who was superintending the work. The foreman not only directed the plaintiff how to do the work, but actually placed the ladder against the trolley wire. When plaintiff asked if it was not dangerous, the foreman assured him that it was safe. Not only so, but the foreman further said, "I will guide the ladder and hold you." In other words, the case is one where the servant not only acted in obedience to a direct command of the master and with an assurance of safety, but also received a promise of protection. Even though it be conceded that plaintiff was charged with knowledge of the fact that the cutting of the span wire would cause the trolley wire to sag and render the ladder unstable, yet in view of the fact that he was entitled to rely upon the superior judgment of the foreman, who not only showed him how to do the work but assured him that the method was safe and promised to protect him, we cannot say that the danger was so obvious that an ordinarily prudent person would have refused to chance it. On the contrary, the question is one about which ordinarily sensible men might entertain a reasonable difference of opinion and was therefore for the jury.

It follows that the court erred in directing a verdict for defendant.

Judgment reversed and cause remanded for a new trial consistent with this opinion.

Whole court sitting, Judges Clarke and Thomas dissenting.

DISSENTING OPINION OF JUDGES THOMAS AND CLARKE.

We fully approve of the rule as stated in the court's opinion that where the master gives assurances of safety and protection in the performance of an ordered task, the question of whether the danger was so obvious and imminent that no person of ordinary prudence would have obeyed is *usually* a question of fact for the jury. But the word "usually" is not in this connection to be treated as synonymous with "always," and its use clearly indicates that there are some exceptions to the rule, as is fully attested by many decisions of this court, among which are Lindsey v. Hillenbeck, 27 Ky. L. R. .68; Nunnelly v. Prather, 157 Ky. 157; L. & N. v. Williams, Admr., 175 Ky. 679, and Oyen v. Willings, 183 Ky. 742; and upon facts in some of the cases not nearly so extreme as here.

The assumed risk of standing on a nail keg in the Prather case was not so obviously dangerous as climbing the ladder and cutting the wire in this case, nor was the one created by the moving band in the Oyen case any more so.

Day, at the time of the accident, was thirty-eight years of age, and as we understand the law, was required to exercise such knowledge and prudence for his own safety, despite any assurances, as are possessed by ordinary men, and if he failed to do so he assumed the risk and should not recover.

If he is not to be charged as matter of law with knowledge that it was dangerous, despite any assurances of safety, to reach above his head with one hand and cut the nearer one of two wires that supported the trolley wire which in turn supported the twenty-two feet extension ladder upon which he was standing near the top, with only a man at the foot of the ladder to guide and steady it in its anticipated drop as far as the trolley wire might sag, then the knowledge attributable to ordinary men is very little indeed. And if he is not likewise to be charged as a matter of law with a lack of ordinary prudence despite any assurances of protection then ordinary men are not very prudent.

Surely if the man who in every community is said to have climbed out on a limb of a tree and sawed the limb off behind him had been assured of safety and pro-

tection by some boss standing on the ground below him, it would not have been necessary to postpone judgment as to whether he exercised ordinary knowledge and prudence until a jury had passed upon the question, and branded him by its verdict as a reckless character.

The case at bar is not, of course, so extreme as that, but it is as surely on the same side of "ordinary knowledge and prudence," and so clearly so as not to require the services of a jury in order to determine the nature of plaintiff's act.

The facts of this case seem to us so very unusual as not to come within any rule that is only *usually* and not *always* applicable, and we feel impelled to respectfully dissent from the court's opinion, because in our judgment it places such a low estimate upon the knowledge and prudence of ordinary men as to indicate an extension of the rule to every case, however obvious the danger, upon evidence of *assurances of safety,* which we are convinced is not the intention or desire of the court.